Gottwald v Sebert (2021 NY Slip Op 02456)





Gottwald v Sebert


2021 NY Slip Op 02456


Decided on April 22, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: April 22, 2021

Before: Acosta, P.J., Oing, Scarpulla, Mendez, JJ. 


Index No. 653118/14 Appeal No. 12716-12716A Case No. 2020-01908, 2020-01910 

[*1]Lukasz Gottwald, Professionally Known as Dr. Luke et al., Plaintiffs-Respondents,
v
Kesha Rose Sebert, Professionally Known as Kesha, Defendant-Appellant, Pebe Sebert et al., Defendants.
Kesha Rose Sebert, Professionally Known as Kesha, Counterclaim-Plaintiff-Appellant,
v
Lukasz Gottwald, Professionally Known as Dr. Luke, et al., Counterclaim-Defendants-Respondents. Samuel D. Isaly, amicus curiae. The Reporters Committee for Freedom of the Press and 16 Media Organizations, Buzzfeed, The Daily Beast Co. LLC, Daily News, LP, Dow Jones & Co., Inc., The E.W. Scripps Co., Gannett Co., Inc., New York Public Radio, Newsday LLC, The Media Institute, MPA-The Association of Magazine Media, National Press Photographers Association, The News Leaders Association, Radio Television Digital News Association, Society of Environmental Journalists, Society of Professional Journalists and Tully Center for Free Speech, amici curiae.


O'Melveny & Myers LLP, New York, (Anton Metlitsky, Leah Godesky, Yaira Dubin and Daniel M. Petrocelli and James M. Pearl of the bar of the State of California, admitted pro hac vice, of counsel), for appellant.
Mitchell Silberberg & Knupp LLP, New York (Jeffrey M. Movit and Christine Lepera and David A. Steinberg of the bar of the State of California, admitted pro hac vice, of counsel), for respondents.
Carter Ledyard & Milburn LLP, New York (Alan S. Lewis and John J. Walsh of counsel), for Samuel D. Isaly, amicus curiae.
Holwell Shuster & Goldberg LLP, New York (Eileen Monaghan DeLucia, Brian T. Goldman and Prishika Raj and Eugene Volokh of th bar of the State of California, admitted pro hac vice of counsel), for The reporters committee for Freedom of the Press and 16 Media Organizations, amici curiae.



Orders, Supreme Court, New York County (Jennifer G. Schecter, J.), entered February 6, 2020, which, to the extent appealed from, upon plaintiffs' and defendant Kesha Rose Sebert's (Kesha) motions for partial summary judgment, determined, in connection with the defamation claims, that plaintiff Gottwald is not a general or limited public figure and that plaintiffs need not prove by clear and convincing evidence actual malice or "gross irresponsibility" on Kesha's part, that Kesha's lawyer and press agent acted as her agents for the purposes of this action, that none of the alleged defamatory statements constitutes hyperbole or nonactionable opinion, and that Kesha's text message to Lady Gaga was defamatory per se, and, upon a search of the record, dismissed Kesha's breach-of-contract affirmative defense based on the implied covenant of good faith and fair dealing, affirmed, without costs.
The third amended complaint alleges that in 2005, plaintiff Gottwald, an established music producer at the time -known for his music, business acumen and the artists he represents- expressed interest in working with Kesha who was then unknown. Kesha agreed to work with Gottwald, and in September 2005, she entered into an exclusive recording agreement with Gottwald's music production company KMI. The KMI agreement obligated Kesha to provide exclusive recording services to KMI, that could be extended by KMI through the release of her sixth album and gave Gottwald the right to produce and receive royalties on at least six songs per album.
The complaint further alleges that shortly after entering into the KMI agreement, Kesha was frustrated that her recording career was not progressing quickly. In late 2005 she retained representatives who, in order to pressure plaintiffs to release her from the KMI agreement, "threatened" to make public a false story that in October 2005, after attending a party together where Kesha had too much to drink, Gottwald had drugged her, took her back to his hotel room and sexually abused her. Gottwald would not accede to the demands or compromise his contractual rights. Subsequently, Kesha and KMI executed multiple amendments to the KMI agreement. In November 2008 Kesha entered into a separate agreement with Prescription, agreeing to be bound by an agreement KMI entered into in 2009 with the RCA/JIVE record label to release and promote her recordings.[FN1] Plaintiffs produced and promoted Kesha's very successful 2010 debut and follow-up albums, which featured songwriting and production contributions from Gottwald.
The complaint alleges that in a 2010 action brought by Kesha's former managers against her and Gottwald, Kesha and her mother Pebe Sebert testified at their depositions that, contrary to their earlier accusations about Gottwald in 2005, he had never drugged Kesha, never made any sexual advances towards her and never had a sexual relationship with her.
The complaint alleges that in 2012 and 2013 Kesha and her agents (Pebe, nonparties Mark Geragos and Kenneth Meiselas — her then attorneys- and Sunshine Sachs, her newly retained public relations firm) sought to end her agreement with Gottwald so she could derive a larger share of profits from any future records. She stopped delivering sound recordings to Gottwald and refused to allow him to produce her work. Pebe and the rest of Kesha's agents orchestrated a "press plan," that included a campaign of publishing "false and shocking" accusations against Gottwald in order to pressure him to release Kesha from the agreements and "blacklist" Gottwald from the music industry. The complaint cites several emails and letters published by Pebe and Kesha in 2013 and 2014 referring to Gottwald's abuse, which, plaintiffs allege were knowingly false. It is also alleged that they also forwarded false information to a social media blogger, Michael Eisele (with whom Kesha was in direct communication), who ran a campaign entitled "Free Kesha," to spread false allegations against Gottwald- insinuating he abused Kesha- across social media to garner support.
The complaint further alleges that on February 26, 2016, after this action was commenced, Kesha initiated a text message conversation with the recording artist professionally known as "Lady Gaga" in which Kesha falsely asserted that she had been raped by Gottwald and that another famous female recording artist (which Kesha named) "was raped by the same man." After the text message conversation, Lady Gaga also spread negative messages about Gottwald in the press.[FN2]
After completion of discovery and filing of a note of issue, plaintiffs' moved for partial summary judgment arguing that: (1) Kesha's text to Lady Gaga was defamation per se, (2) the statements made by Pebe, Geragos, Meiselas, Sunshine Sachs and Eisele were made in their capacity as Kesha's agents, and (3) Kesha's affirmative defenses to the defamation claims fail as a matter of law. Kesha opposed plaintiffs' motion and moved for partial summary judgment arguing that: (1) Gottwald is a public figure and can only recover for defamation if the statements asserting that he drugged, raped and sexually assaulted her were made with actual malice, (2) 27 of the statements were made either during settlement discussions as pertinent to good-faith anticipated litigation (by Kesha in litigation filings, or by her or her attorneys to contextualize litigation developments), (3) 18 of the statements constituted protected opinion or hyperbole that cannot be actionable, and (4) Gottwald breached the KMI agreement's implied covenant of good faith and fair dealing.
Supreme Court granted, in part, Gottwald's motion for partial summary judgment and denied Kesha's motion for partial summary judgment. On this record, we now affirm.
The record demonstrates that, while Gottwald is an acclaimed and influential music producer, he does not occupy a position of "such pervasive fame or notoriety that he [has] become[] a public figure for all purposes and in all contexts" and that he did not "become[] a public figure for a limited range of issues" by "voluntarily inject[ing] himself" into the public debate about sexual assault, or abuse of artists in the entertainment industry (Gertz v Robert Welch, Inc., 418 US 323, 351 [1974]).
A person can only be a general-purpose public figure if "he [or she] is a 'celebrity'; his [or her] name a 'household word' whose ideas and actions the public in fact follows with great interest "and 'invite[s] attention and comment'"(Waldbaum v Fairchild Publs, Inc., 627 F2d 1287,1292 [DC Cir 1980], cert denied 449 US 898 [1980], quoting Gertz at 345).
"Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life" (Gertz at 352). Contrary to the dissent, Gottwald's success in the music business is not enough to bring him into the realm of a general-purpose public figure, even if the music he produces is known to the general public or he is associated with famous or household word musicians, especially where he has used his efforts as a producer to obtain publicity not for himself, but for the artists that he represents (Krauss v Globe Intl., 251 AD2d 191 [1st Dept 1998]). Although he is an acclaimed music producer and well known in the entertainment industry, he is not a household name.[FN3] His success in a high-profile career, without more, does not warrant a finding that he is a general-purpose public figure (see Waldbaum at 1299).
A limited-purpose public figure, more commonly, is an individual who has voluntarily injected himself or is drawn into a particular public controversy with a view toward influencing it. "[T]he [individual becomes] a public figure by virtue of his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy" (Naantaanbuu v Abernathy, 816 F Supp 218, 222 [SD NY 1993] [internal quotation marks omitted]). The individual must attempt to have, or can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants (Waldbaum at 1300). Here, contrary to the dissent's view, the specific public dispute as framed by Kesha is sexual assault and the abuse of artists in the entertainment industry.
To determine whether a plaintiff is a limited purpose public figure the "defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media" (Lerman v Flynt Distrib. Co., Inc., 745 F2d 123, 136-137 [2d Cir 1984], cert denied 471 US 1054 [1985]). "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention" (Wolston v Reader's Digest Assn. Inc., 443 US 157, 167 [1979]). "In order to be considered a public controversy. . . the subject matter must be more than simply newsworthy. . . it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way" (Krauss v Globe Intl., 251 AD2d at 192 [internal quotation marks and citations omitted]).
A person may generally not be made a public figure through the unilateral acts of another (United States v Sergentakis, 2015 WL 3763988, *6, 2015 US Dist Lexis 77719, *14 [SD NY 2015], affd 787 Fed Appx 51 [2d Cir 2019], citing Chandok v Klessig, 648 F Supp 2d 449, 458 [ND NY 2009]). "[A]n individual can become a limited purpose public figure only through his own actions." The degree of voluntary involvement in the public controversy is important (Biro v CondÉ Nast, 963 F Supp 2d 255, 274 [SD NY 2013], affd 622 Fed Appx 69 [2d Cir 2015], cert denied -US-, 136 SCt 2015 [2016]).
To be considered a limited purpose public figure Gottwald must have: (1) successfully invited public attention to his views in an effort to influence others prior to the incident in question, (2) voluntarily injected himself into a public controversy related to the subject of the current litigation, (3) assumed a position of prominence in the public controversy, and (4) maintained a regular and continuing access to the media to influence the outcome of the public controversy.
Gottwald cannot be found to be a limited-purpose public figure because he has not done any of these things.
Although Gottwald has sought publicity for his label, his music and his artists — none of which are subject of the defamation here- he never injected himself into the public debate about sexual assault or abuse of artists in the entertainment industry. Gottwald has only spoken out once regarding this litigation, on Twitter in 2016, and has limited his involvement to what was necessary to defend himself (Wolston, 443 US at 167).
The dissent argues that "[t]he definition of limited purpose public figure is not so cramped as to only include individuals and entities that purposefully speak about the specific, narrow topic (in this case a protÉgÉ's sexual assault) upon which the defamation action is based," but fails to acknowledge that a limited purpose public figure only holds that status with regards to the particular public controversy they thrust themselves into.
Gottwald, a successful music producer, has not attracted media attention for his relationship with his clients or his treatment of artists in the entertainment industry but for his work as a music producer on behalf of, and the fame of, the artists he represents. Unlike the cases cited by the dissent, where the plaintiffs sought publicity regarding the public controversies which were the subject of their litigation (Winklevoss v Steinberg, 170 AD3d 618, 619 [1st Dept 2019], appeal dismissed 33 NY3d 1043 [2019] [the plaintiffs attracted public attention to themselves as investors in start-ups, voluntarily injected themselves into the world of investing through conferences, interviews and a radio broadcast, and sought to establish their reputation as authorities in the field]; Maule v NYM Corp., 54 NY2d 880, 883 [1981] [where the plaintiff's books, articles and personal appearances were designed to project his name and personality to establish his reputation as a leading authority on professional football, and actively sought publicity for his views and professional writings, which were the subject of the litigation]; Park v Capital Cities Communications, 181 AD2d 192, 197 [4th Dept 1992], appeal dismissed 80 NY2d 1022 [1992], lv dismissed in part, denied in part 81 NY2d 879 [1993] [where Dr. Park stepped outside the private realm of his practice, actively sought publicity regarding his performance of eye surgery by appearing on television shows, found to be a public figure for purposes of the "Park Probe," an expose on unnecessary eye surgery]), Gottwald has not.
Gottwald has appeared in articles in mainstream media for his contributions to pop music, his discovery and development of talent, his rise in the music industry and his talent as both a businessman and music producer.[FN4] However, he has not injected himself into the debate about sexual assault or abuse of artists in the entertainment industry, which is the subject of the defamation. That fact distinguishes this case from those cited by the dissent.
Plaintiffs are not required and, even assuming this were a matter of public concern would not be required, to show that Kesha acted in a "grossly irresponsible" manner, since Kesha is not a media publication, broadcaster or journalist responsible for observing "the standards of information gathering and dissemination ordinarily followed by responsible parties" (Chapadeau v Utica Observer—Dispatch, 38 NY2d 196, 199 [1975]; see Huggins v Moore, 94 NY2d 296, 302 [1999]). The gross irresponsibility standard focuses on the journalist's satisfaction of objective professional standards (Kahn v New York Times Co., 269 AD2d 74, 76 [1st Dept 2000]). Chapadeau dealt with news media publishing and is applicable to media publications and journalists. The court looks to see if the media defendant "has met the standards of basic reporting. . . in the context of the medium's limitations and the topic's continuous newsworthiness. Pressures of time, staff, and budget, self-created or otherwise, are some of the factors which must be considered" (Greenberg v CBS, Inc., 69 AD2d 693, 710-711 [2d Dept 1979]; see McGill v Parker, 179 AD2d 98, 108 [1st Dept 1992]). None of these factors apply to Kesha.
Issues of fact exist as to the applicability of the litigation privilege to statements made in Kesha's California action, since a jury could find that Kesha commenced that action, in which she alleged that Gottwald drugged and raped her, to pressure Gottwald into renegotiating her contracts or to release her from her contracts with plaintiffs (see Flomenhaft v Finkelstein, 127 AD3d 634, 637 [1st Dept 2015]). The litigation privilege provides that a statement that is pertinent to litigation is privileged and cannot be the basis of a defamation action. To determine if a statement is pertinent to litigation or can be the basis for a defamation action, the offending statement must have been "outrageously out of context" (id. [internal quotation marks omitted]). The litigation privilege "will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant" (id. at 638, citing Lacher v Engel, 33 AD3d 10 [1st Dept 2006]). Here, Kesha argues that she commenced her California action in good faith and not to defame or pressure plaintiffs into renegotiating her contracts. The record shows that there are factual issues as to whether Kesha's public relations team, Sunshine Sachs, created a press plan to pressure plaintiffs into renegotiating or releasing Kesha from her contracts. That record supports plaintiffs' allegation and creates an issue of fact as to whether the California complaint was a "sham" precluding the grant of summary judgment.
Kesha can be held liable for any defamatory statements made by her lawyer and her press agent, since they acted as her agents in making the statements. However, issues of fact exist whether Kesha's mother and Michael Eisele, the blogger, were her agents.
A person authorizing others to speak on their behalf can be held vicariously liable for defamatory statements made by its agents (National Puerto Rican Day Parade, Inc. v Casa Publs. Inc., 79 AD3d 592, 594-595 [1st Dept 2010]). However, a person is not responsible for the recommunication of their original defamatory statement if the recommunication was done without the person's authority or request over another whom the person has no control (Hoffman v Landers, 146 AD2d 744, 747 [2d Dept 1989]).
Geragos and Sunshine Sachs were acting as Kesha's agents. Geragos was Kesha's lawyer who held authority to speak on her behalf. He filed the complaint in California and hired Sunshine Sachs as the public relations agency responsible for the publicity surrounding the California complaint. Sunshine Sachs was hired for the sole purpose of managing Kesha's publicity and to formulate a press plan on how to interact and disseminate information, with the press.
While Geragos and Sunshine Sachs were acting as Kesha's agents, there are issues of fact as to whether Pebe and Eisele's statements about Gottwald were made as Kesha's agents. It is unclear if Pebe's statements about Gottwald were made as Kesha's agent or as her mother, with an independent purpose, and if Eisele's statements were made as Kesha's fan, or under Kesha's direction in order to help the publicity around her California complaint.
Kesha's statements that Gottwald drugged her, that he raped her, and that he abused her do not constitute hyperbole or nonactionable opinions (see Thomas H. v Paul B., 18 NY3d 580, 585-586 [2012]). The determination whether a statement is opinion or objective fact is a question of law (Mann v Abel, 10 NY3d 271, 276 [2008], cert denied 555 US 1170 [2009]). An opinion cannot be proven false and therefore does not give rise to liability for defamation purposes (Thomas H. at 585-586). Kesha's statements assert that Gottwald drugged and raped her. These statements are not opinion or hyperbole because they can be found to be factual as a matter of law. They are not exaggerations, assert a literal event that is alleged to have occurred, are not protected opinion or hyperbole and can be actionable for defamation.
Kesha's text message to Lady Gaga, that Gottwald had raped another singer, was defamatory per se (see e.g. Torati v Hodak, 147 AD3d 502 [1st Dept 2017]).
Supreme Court correctly dismissed Kesha's affirmative defense to the breach of contract claim, upon a search of the record (CPLR 3212[b]). All contracts contain an implied covenant of good faith and fair dealing (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 153 [2002]). In New York, the implied covenant of good faith and fair dealing "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights" (Fesseha v TD Waterhouse Inv. Servs., 305 AD2d 268, 268 [1st Dept 2003]).
Supreme Court properly determined that Gottwald had no contractual duty to renegotiate any of his agreements with Kesha. Kesha's music industry expert claims that it is the custom and practice of the music industry to renegotiate initial contracts with new artists if the artists achieve some degree of commercial success. The duty of good faith and fair dealing does not imply obligations inconsistent with contractual provisions (Chase Equip. Leasing Inc. v Architectural Air, LLC, 84 AD3d 439 [1st Dept 2011], citing 511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d at 153). Therefore, Supreme Court properly dismissed Kesha's affirmative defense sua sponte because plaintiffs were under no obligation to renegotiate any of the agreements they had with her. The implied covenant of good faith and fair dealing could not impose upon plaintiffs an obligation to renegotiate Kesha's contracts that is not found in the contracts (see Fesseha at268).
We have considered Kesha's remaining arguments and find them unavailing.
All concur except Oing and Scarpulla, JJ.
who dissent in part in a memorandum by
Scarpulla, J. as follows:




SCARPULLA, J. (dissenting in part)


I respectfully dissent from the portion of the majority's decision which determines that plaintiff Lukasz Gottwald is not a general purpose public figure or, at a minimum, a limited purpose public figure, in connection with analyzing his defamation claims.
This action concerns the claim of a well-known music producer that one of his protÉgÉs falsely accused him of sexual assault to be released from an exclusive recording contract with his label. In October 2005, defendant Kesha Rose Sebert (Kesha) a teenage recording artist, signed an agreement which, among other things, granted plaintiff, known professionally and world-wide as "Dr. Luke" (Dr. Luke), exclusive rights to produce her music. Shortly thereafter Dr. Luke and Kesha attended a party at a night club. There, they both drank, and Kesha alleges that Dr. Luke gave her a roofie. Thereafter, Dr. Luke and Kesha went to an afterparty, where Kesha continued drinking, became ill, and was ultimately removed from premises. Dr. Luke then took Kesha to his hotel, where she spent the night. Kesha alleges that Dr. Luke sexually assaulted her that night. Dr. Luke's defamation claims in this action relate to Kesha's allegation that Dr. Luke sexually assaulted her.
Despite the fact that Dr. Luke has had a well-documented, successful musical career for more than two decades and Kesha is one of his famous protÉgÉs, Dr. Luke has maintained throughout this litigation that he is a private figure, and that Kesha's sexual assault allegations against him should not be subject to a heightened standard of defamation review. However, as the Court of Appeals stated in James v. Gannett Co.,the "category of 'public figures' is of necessity quite broad" and that performing artists, like Dr. Luke "have not necessarily taken an active part in debates on public issues, they remain, nevertheless, persons in whom the public has continuing interest"(40 NY2d 415, 422 [1976]).
The record here amply demonstrates that Dr. Luke was, at the relevant time, a "public figure" for purposes of reviewing Kesha's allegedly defamatory statements that he sexually assaulted her. Dr. Luke was (and is) a widely acclaimed and influential music producer who actively sought publicity for himself, his label, his music, and the artists that he represents (see Gertz v Robert Welch, Inc., 418 US 323 [1974]; James, 40 NY2d at 421-22 ["[P]ublic figures . . . . invite attention and comment"] [internal quotation marks omitted]; see also Garfinkel v Twenty-First Century Publ. Co., 30 AD2d 787, 788 [1st Dept 1968] ["owner and publisher of a high school basketball scouting report" considered public figure because "[b]asketball and basketball scouting are matters of general public interest, particularly in light of the great attraction the game has for the public"]).
Throughout his career, Dr. Luke has promoted and publicized his contributions to the success of the recording artists contractually attached to his label, and, in particular, up and coming female artists. Dr. Luke has co-written and/or co-produced numerous hit songs for various prominent female artists, for which he is also well known. Dr. Luke has received numerous accolades: he was named one of the top music producers of the 2000's by Billboard; the American Society of Composers, Authors, and Publishers named him Producer of the Year from 2009-2011; he has been nominated for the Grammy award, Producer of the Year; and, in 2010, he was named #33 in Fast Company's "100 Most Creative People in Business" list. In 2010, Dr. Luke was selected by the Grammy and Recording Academy, and participated in, in a congressional roundtable. In 2013, Dr. Luke was selected to be an American Idol judge, and in 2014, Dr. Luke was selected to receive a star on the Hollywood Walk of Fame.
Moreover, Dr. Luke has actively sought out publicity. He has hired public relations agents, and he has been interviewed, profiled, photographed, and mentioned by numerous periodicals, including the New Yorker, New York Magazine, The Guardian, Rolling Stone, and Billboard. He participated in interviews on prime-time television and on the red carpet at several awards shows. Dr. Luke has also been active on social media. For example, he has more than 200,000 followers on his verified Twitter account,[FN5] which he uses to talk about his professional and personal life to his followers, including his relationships with the artists whom he represents.
In sum, over many years Dr. Luke has received broad and extensive press coverage as a music producer and, in particular, as a discoverer and developer of female music talent. He has pervasively sought out this publicity. Dr. Luke's protestations that he was not well known at the time of the alleged defamatory statements is thoroughly belied by the record. Under these circumstances, Dr. Luke must prove actual malice in order to prevail on his defamation and defamation-dependent claims.
The majority acknowledges that Dr. Luke is an acclaimed music producer but posits that he is not a general purpose public figure because he is not a "household name." Dr. Luke, however, has achieved a level of fame and notoriety sufficient to be considered a general purpose public figure. He is a household name to those that matter. For this reason, he should be considered a general purpose public figure in connection with analyzing the alleged defamatory statements at issue (see Winklevoss v Steinberg, 170 AD3d 618, 619 [1st Dept 2019], appeal dismissed, 33 NY3d 1043 [2019] ["The individual plaintiffs are also general purpose public figures, famous by virtue of their participation in the Olympics, their portrayal in [a] film . . . , and routine coverage in popular media coverage in which they willingly participate"]).
The majority's assertion — that Dr. Luke "used his efforts as a producer to obtain publicity not for himself, but for the artists that he represents" is belied by the record. Moreover, the majority's reliance on Krauss v Globe Intl. (251 AD2d 191 [1st Dept 1998]) is misplaced. There, the "plaintiff used his efforts as producer and ghost-writer to obtain publicity for his wife's career as a television personality, including publicity about her life as wife and mother. However, there is no basis to find that he ever sought, or achieved, a meaningful level of public attention for himself" (Krauss, 251 AD2d at 193). Unlike the plaintiff in Krauss, who "was not famous by his own right" (id. at 192), the record contains numerous evidentiary bases to find that Dr. Luke sought and achieved a meaningful level of public attention for himself, not simply for his protÉgÉs.
Even assuming that Dr. Luke is not a general purpose public figure, at a minimum, Dr. Luke should be treated as a limited purpose public figure in connection with the dynamics of his relationship to the artists with whom he works and upon which he has built his well-known professional reputation (see Daniel Goldreyer, Ltd. v Dow Jones & Co., 259 AD2d 353, 353 [1st Dept 1999] ["Plaintiff is an art restorer, controversial and well-known in the profession, but not outside of it."]). Limited purpose public figures are "those who 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved'" (Huggins v Moore, 94 NY2d 296, 301-302 [1999], quoting Gertz, 418 US at 345; accord Krauss, 251 AD2d at 192-193).
Dr. Luke argues, and the majority accepts, that Dr. Luke is not a limited purpose public figure because he never sought out publicity or spoke publicity about Kesha's allegations of sexual assault or on the issue of sexual assault. That Dr. Luke has not spoken publicly about Kesha's allegations of sexual assault is not surprising, is not relevant, and does not preclude a finding that he is a limited purpose public figure. The definition of limited purpose public figure is not so cramped as to only include individuals and entities that purposefully speak about the specific, narrow topic (in this case a protÉgÉ's sexual assault) upon which the defamation claim is based.
The public controversy at issue here is a self-promoting, powerful music industry person's use of his financial leverage over a person whose career he controls to allegedly commit an unpunished sexual assault (see generally Daniel Goldreyer, Ltd., 259 AD2d at 353). Dr. Luke is a limited purpose public figure because he has purposefully and continuously publicized and promoted his business relationships with young, female music artists, like Kesha, to continue to attract publicity for himself and new talent for his label (see generally James, 40 NY2d at 421-422). The allegedly defamatory statements at issue — that Dr. Luke drugged and sexually assaulted Kesha when she was a teenage artist, who was signed to an exclusive contract with his record label — directly relate to Dr. Luke's self-publicized professional and personal relationships with his clients, his integrity in business practices, and in attracting new talent (Winklevoss, 170 AD3d at 619; see also Maule v NYM Corp., 54 NY2d 880, 883 [1981] ["plaintiff not only welcomed but actively sought publicity for his views and professional writing and by his own purposeful activities thrust himself into the public eye"]; Park v Capital Cities Communications, Inc., 181 AD2d 192, 197 [4th Dept 1992], appeal dismissed 80 NY2d 1022 [1992], lv dismissed in part, denied in part 81 NY2d 879 [1993] [plaintiff "was not involuntarily thrust into an unwanted limelight, but rather, invited favorable publicity for his practice"]).
Because Dr. Luke is, at a minimum, a limited purpose public figure, Dr. Luke was "required to show by clear and convincing evidence that defendant[] published the statements at issue with actual malice" (Perez v Violence Intervention Program, 116 AD3d 601, 601 [1st Dept 2014], lv denied 25 NY3d915 [20150), and the "grossly irresponsible" standard — set forth in Chapadeau v Utica Observer—Dispatch (38 NY2d 196, 199 [1975]) and upon which the majority relies — is inapplicable (see Khan v New York Times Co., Inc., 269 AD2d 74, 76 [1st Dept 2000] ["[T]he court mistakenly applied an objective standard of gross irresponsibility, which is only applicable to private figures, rather than applying the subjective actual malice standard applicable to a 'limited-purpose public figure' such as plaintiff."]).
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: April 22, 2021



Footnotes

Footnote 1: The RCA/JIVE agreement was subsequently assigned to a subsidiary of Sony Music Entertainment (Sony) whose General Counsel Kesha's attorney is alleged to have threatened with a similar lawsuit.

Footnote 2: That famous female recording artist testified unequivocally that Gottwald never raped her.

Footnote 3: Gottwald was named one of a hundred most creative people in business but was not selected as a judge in American Idol and did not receive a star in Hollywood's walk of fame.

Footnote 4: John Seabrook, The Doctor Is In: A Technique for Producing No. 1 Songs, The New Yorker [Oct. 7, 2013] https://www.newyorker.com/magazine/2013/10/14/the-doctor-is-in [last accessed Feb. 14 2021]; Adam Sternbergh, The Hit Whisperer, New York Mag [June 16, 2010] https://nymag.com/guides/summer/2010/66784/[last accessed Feb. 14, 2021]; Chris Willman, Dr. Luke: The Billboard Cover Story, Billboard [Sept. 3, 2010] https://www.billboard.com/articles/news/956518/dr-luke-the-billboard-cover-story [last accessed Feb. 14, 2021]; Dr. Luke: The Man Behind Pop's Biggest Hits, NPR: Moring Edition [Sept. 20, 2010] https://www.npr.org/templates/story/story.php?storyId=129956645 [last accessed Feb. 14, 2021]; Luke Lewis, The Producer Behind Smash Hits for Katy Perry and Kesha, The Guardian [Aug. 13, 2010] https://www.theguardian.com/music/2010/aug/14/dr-luke-katy-perry-gottwald [last accessed Feb. 14, 2021]; Matt Popkin, Dr. Luke: A Pop Star's Best Friend, American Songwriter [2010] https://americansongwriter.com/songwriter-u-dr-luke-a-pop-stars-best-friend/#comments-section [last accessed Feb. 14, 2021].

Footnote 5: Verified twitter accounts "let[] people know that an account of public interest is authentic," and to be verified, a user's "account must be notable and active" (Verification FAQ, https://help.twitter.com/en/managing-your-account/twitter-verified-accounts) (last accessed Feb. 19, 2021).