Verdi v Dinowitz (2024 NY Slip Op 04287)

Verdi v Dinowitz

2024 NY Slip Op 04287

Decided on August 22, 2024

Appellate Division, First Department

SINGH, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 22, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Anil C. Singh Lizbeth González Bahaati E. Pitt-Burke LlinÉt M. Rosado

Index No. 158747/16 Appeal No. 1982 Case No. 2023-01034 

[*1]Manuele Verdi etc., Plaintiff-Respondent-Appellant,
v
Jeffrey Dinowitz etc., Defendant-Appellant-Respondent.

Defendant appeals and plaintiff cross-appeals from an order of the Supreme Court, New York County (Lynn R. Kotler, J.), entered January 31, 2023, which granted plaintiff's motion for partial summary judgment, in part, and denied defendant's cross-motion for summary judgment dismissing the complaint.

Patterson Belknap Webb & Tyler LLP, New York (Charles G. Moerdler, Harry Sandick and NicolÁs Q. GalvÁn of counsel), and Stroock & Stroock & Lavan LLP, New York (Ernst H. Rosenberger of counsel), for appellant-respondent.
Ezra B. Glaser & Associates, Brooklyn (Ezra B. Glaser of counsel), for respondent- appellant.

SINGH, J. 

On this appeal, we are asked to decide whether Supreme Court should have dismissed plaintiff Manuele Verdi's defamation claims for failing to establish falsity, damages, or actual malice. At summary judgment, the motion court determined that defendant, New York State Assemblyman Jeffrey Dinowitz, published false statements about Verdi and left the question of whether he acted with actual malice to the factfinder. We now reverse, as Dinowitz's statements were nonactionable opinion given the context in which they were made. Moreover, Verdi failed to demonstrate by clear and convincing evidence that Dinowitz acted with actual malice.
Factual Background
This longstanding dispute arose out of a series of statements that Dinowitz made from October 2015 through May 2016. Verdi was a guidance counselor at P.S. 24 prior to becoming an assistant principal in 2011. Due to overcrowding at the school, additional classroom space (the Annex) was located at a nearby apartment building for several years. The Annex lease expired in June 2015. As a result, those students were transferred back to the school's main building, exacerbating the overcrowding.
In October 2015, P.S. 24's Parents' Association (PA) invited Dinowitz to attend a meeting at the school along with Verdi, then-principal Donna Connelly, and other administrators. Witnesses testified that the meeting's atmosphere turned vitriolic after the parents were made aware that the Annex lease had not been renewed and the extra classroom space had been lost. One of the parents stood up to address all the attendees and blamed past PA presidents, school administrators, and elected officials both for the loss of the Annex and for not informing parents that the lease was in jeopardy.
According to Verdi, Dinowitz then took to the microphone and "lied by stating that it was [Verdi's] fault . . . for not negotiating the lease correctly and for not acting — and basically blaming [Verdi and Connelly], lying and blaming [Verdi and Connelly] for all the actions" surrounding the loss of the Annex. Verdi claims that Dinowitz stated: "Mr. Verdi and Principal Connelly are both incompetent" and "derelict in their duties"; that the loss of the Annex lease was "their responsibility"; and that "the fault lies with them." Verdi also spoke at the meeting and challenged Dinowitz's accusations, stating that [*2]neither he nor Connelly had been advised that the school was in danger of losing the lease.
Shortly after the PA meeting, Connelly retired, apparently due to public backlash resulting from the loss of the Annex lease and other unrelated incidents at the school. Melodie Mashel, the district superintendent, appointed the school's other assistant principal, Andrea Feldman, as interim acting principal. In early 2016, a search committee was formed to find a new principal for P.S. 24. At that time, Verdi did not have the proper credentials to be hired as principal and had not applied for the position. In March 2016, Connelly was interviewed by the Riverdale Press. The article, entitled Ex-principal says she was bullied into quitting, quoted Dinowitz as stating: "[Verdi and Connelly] kept parents in the dark, they sat on their hands and they let disaster happen." The article also quoted Verdi as stating to Dinowitz at the PA meeting, "you never miss a photo op, but you did not come into our office to discuss" the danger of losing the Annex lease.
In April 2016, Verdi filed a complaint with the New York City Special Commissioner of Investigation because Mashel permitted Dinowitz's chief of staff, Randi Martos, to be present and involved at student registration events. Verdi alleged that Martos actively assisted in the registration process, including checking proofs of address, opening student medical and academic records, and insisting on several occasions that parents produce three pieces of identification, which was not usually required.
On May 2, 2016, Verdi filed a federal lawsuit against the New York City Department of Education (DOE), the City of New York, and several individual school administrators, alleging retaliation in response to his "whistleblowing." Although Dinowitz was not initially named as a defendant, Verdi's complaint contained allegations that Dinowitz and his staff violated federal law by reviewing private student records containing personal information and that these efforts to restrict student enrollment were racially motivated. The complaint also alleged that Dinowitz and other local officials conspired against Verdi to bar him from replacing Connelly as principal.
The search for a new principal was halted after Verdi's attorney, Ezra Glaser, sent several letters to the DOE's chancellor, which demanded that the search be suspended pending the investigation into Mashel and others. Verdi applied for the position when the process resumed. Ultimately, Steven Schwartz was appointed as the new principal for P.S. 24.
After Verdi filed his federal lawsuit, Dinowitz was interviewed by local media on several occasions. A May 3, 2016 Riverdale Pressarticle, entitled PS 24 assistant principal sues DOE, opened with Verdi's accusation that Dinowitz was "seeking to keep minority and lower-income students out of [P.S. 24]." Dinowitz is quoted as stating: "In a desperate attempt to create a smokescreen to divert attention from the fact [*3]that he's the main reason for the severe overcrowding crisis at P.S. 24, Manny Verdi has brought a lawsuit containing one lie after another" and that "[Verdi] alone is responsible for that school not having a principal and this overcrowding crisis would not have happened but for Manny Verdi." The article also provided details from Verdi's complaint, including Verdi's claim that, during a 2009 meeting, Dinowitz stated that "he knows who the children are that are not from Riverdale 'by the way they walk, talk and wear their pants.' " Dinowitz denied making such remarks.
A May 2016 Riverdale Review article, entitled Manny Verdi's Plan: Save my job or it's 'Scorched Earth' at P.S. 24, explained that Verdi's lawsuit charged "a racist agenda of local elected officials, led by [Dinowitz]." Dinowitz denied the accusations, stating that "[n]o one objects to any child of any race attending P.S. 24. We are concerned with the previous policies of [Verdi and Connelly] which apparently resulted in perhaps hundreds of children enrolling at P.S. 24 over recent years who do not live in the zone." Dinowitz is further quoted as stating, "I specifically told [Verdi] to pay attention to [the Annex lease], advice he chose to ignore. In my view, [Verdi] and Ms. Connelly are totally responsible for both the loss of space and the over-enrollment issue. Injecting race into the argument is nothing more than a desperate attempt to reopen the hiring process for principal to either save his current job or somehow be considered as a candidate for principal."
Dinowitz additionally made a statement to WPIX-11 on May 9, 2016 that "Mr. Verdi and Mrs. Connelly made it their policy to enroll virtually every student in the school regardless of where they live and regardless whether or not seats were available."
Despite the local media circus and a strained working relationship with Schwartz, which resulted in an unfavorable performance review, Verdi remained in the assistant principal role until he retired in December 2017. Verdi's federal lawsuit was settled in October 2018.
Procedural History
Verdi commenced this action against Dinowitz, in his individual and official capacities, on October 18, 2016. Pursuant to an amended complaint filed on or about January 10, 2017, Verdi asserted causes of action for defamation, libel, and slander, among other claims. The fourth count was based on the statements that Dinowitz allegedly made during the October 2015 PA meeting; the fifth count was based on the May 2016 statements that Dinowitz made to the Riverdale Review; the sixth count was based on the March 2016 and May 2016 statements that Dinowitz made to the Riverdale Press; and the eighth count was based on the May 2016 statement that Dinowitz made to WPIX-11.
Dinowitz's Motion to Dismiss
On February 2, 2017, Dinowitz moved to dismiss the complaint. The motion court (Bluth, J.) denied the motion with respect to Verdi's claim that Dinowitz defamed him by blaming him for the school's [*4]overcrowding issue and held that Dinowitz's statements were not privileged because he was not working in his official capacity as a legislator. The court determined that if Dinowitz's statements regarding Verdi's role in the overcrowding at the school were false, then there was "little question" that they subjected Verdi to public ridicule and further held that the statements were not opinion. The court granted Dinowitz's motion with respect to certain statements made specifically in response to Verdi's allegations against him in the federal lawsuit. On May 1, 2018, this Court affirmed in part on the pleadings, finding that "[t]he motion court correctly determined that some the complained-of statements were susceptible of a defamatory meaning. Considering the context of the statements, the court properly determined that they signaled that [Dinowitz] was asserting a fact rather than opinion" (Verdi v Dinowitz, 161 AD3d 413, 414 [1st Dept 2018]).
Verdi filed a second amended complaint seeking punitive damages on November 7, 2019, which included additional statements that Dinowitz made to the Riverdale Review in November 2015. The motion court granted Dinowitz's motion to dismiss to the extent of dismissing Verdi's claim for punitive damages. We affirmed, finding that the complaint failed to allege that Dinowitz was "solely motivated by a desire to injure [Verdi]" when he made the statements (Verdi v Dinowitz, 188 AD3d 441, 442 [1st Dept 2020] [internal quotation marks omitted]).
Relevant Deposition Testimony
Following the February 2017 decision, depositions were conducted. Verdi testified that, as assistant principal, his primary duty was supervising teachers. He additionally oversaw the school's special education programs, restructured classrooms at the end of the year, and ran the school when Connelly was unavailable. His responsibilities did not include negotiating leases or overseeing student enrollment. He stated that he retired "under duress" due to a "hostile work environment created by Mr. Dinowitz and his minions."
Regarding the loss of the Annex lease, Mashel testified that the School Construction Authority (SCA) was responsible for negotiating leases on behalf of New York City public schools. Mashel additionally testified that she defended Verdi and Connelly at the October 2015 PA meeting by stating that they were not responsible for negotiating the lease. Her supervisor, Laura Feijoo, also testified that principals and assistant principals have no authority to negotiate leases. Feijoo further stated that an assistant principal is not supposed to rally the community against decisions made by the SCA or the DOE and that there were internal channels available for airing grievances.
Dinowitz testified that he was notified by the president of the apartment building's tenants' association that the SCA was not responding to the building's inquiries regarding renewal of the Annex lease, which was set to expire in June 2015. Dinowitz stated [*5]that he informed Verdi and Connelly of the danger of losing the lease at P.S. 24's annual spring fundraiser, while Verdi testified that the first time he heard about the expiration of the Annex lease was approximately one week before the October PA meeting. Despite acknowledging that he sent an email in January 2017 in which he stated that administrators at P.S. 24 were not responsible for negotiating the lease, Dinowitz also testified that he "certainly blamed" Verdi and Connelly in part for the loss of the lease and that they were not relieved of their obligation to fight for the school simply because lease negotiations were not within their purview.
As to the overcrowding at P.S. 24, Dinowitz testified that he believed Verdi was accepting otherwise ineligible out-of-zone students into the school based on conversations that he had with parents, school staff, colleagues, and other members of the community. Other witnesses — including Mashel, past PA President Laura Moukas, former New York City Councilmember Andrew Cohen, and P.S. 24 parent coordinator Florence Byrne — testified that they held the same belief. Dinowitz also denied tainting Schwartz's perception of Verdi's ability to perform his duties and asserted that any unsatisfactory performance reviews Verdi received were based solely on Schwartz's professional judgment.
Marvin Shelton, of the District Community Education Council, and Schwartz both testified that enrollment was handled by a department other than P.S. 24 administrators. Shelton stated that students' registration information was entered into a computer, which then calculated whether each student met the requirements for enrollment. Shelton and Schwartz also testified that while many of the students at P.S. 24 resided outside the zone, this was largely due to the school's gifted and talented program and plans for students needing individualized education. The siblings of these students were also permitted to attend the school.
Glaser, Verdi's attorney, testified that the May 3, 2016 Riverdale Press article and the transcript of the WPIX-11 segment were republished in their entirety on the website of his then law firm. Glaser stated that Verdi was aware that the articles would be posted, and Verdi did not dispute his consent.
Verdi's Motion for Summary Judgment
On September 5, 2021, Verdi moved for summary judgment to establish as a matter of law that: (1) Dinowitz published false statements about him as alleged in counts four, five, six, and eight of the amended complaint; (2) Dinowitz was not privileged or authorized to publish these false statements; (3) the statements exposed Verdi to public contempt, ridicule, aversion, or disgrace; and (4) Dinowitz acted in a grossly irresponsible manner by publishing these statements. Dinowitz cross-moved for summary judgment on December 21, 2021 to dismiss the action and limit Verdi's recovery to nominal damages.
On January 27, 2023, Supreme Court (Kotler, J.) granted Verdi's motion [*6]to the extent of finding that Dinowitz published false statements about him as alleged in counts four, five, six, and eight in the amended complaint. The court found that the law of the case doctrine required a finding that Dinowitz made defamatory remarks and was not entitled to absolute immunity. The court also determined that it was law of the case that Verdi could not claim that Dinowitz acted with common-law malice.
After reviewing the deposition testimony, the court held that Dinowitz's statements were false because Verdi proved that he did not have the authority to negotiate leases or handle enrollment of students. Further, Dinowitz did not couch his statements in a manner that would allow a listener to conclude that he was giving his opinion or stating rumors. Although the court rejected Dinowitz's argument that Verdi was a limited purpose public figure, the court left open the question of whether Dinowitz's statements were entitled to the qualified privilege of fair comment and criticism applicable to matters of public concern. Finally, the court concluded that the factfinder must determine whether Dinowitz acted with actual malice, which would defeat the qualified privilege, and decide the amount of damages to which Verdi is entitled.
Discussion
Contrary to the motion court's determination, the law of the case doctrine is inapplicable to the parties' respective motions for summary judgment (see Alvarado v City of New York, 150 AD3d 500, 500 [1st Dept 2017]). The motion court's 2017 decision denying Dinowitz's motion to dismiss Verdi's defamation claims and this Court's affirmance (Verdi,161 AD3d at 414) were based on the facts and law presented by the parties on the pleadings (see 191 Chrystie LLC v Ledoux, 82 AD3d 681, 682 [1st Dept 2011]). While the alleged defamatory statements have not changed since Dinowitz filed his motion to dismiss, the scope of review at summary judgment is distinct and the evidence regarding the context in which these statements were made has fully developed (see Riddick v City of New York, 4 AD3d 242, 245 [1st Dept 2004]; see also Bernard v Grenci, 48 AD3d 722, 724 [2d Dept 2008] [reversing denial of the defendant's motion for summary judgment on the grounds that the motion court incorrectly held the law of the case doctrine bound the court to the findings of its previous order, which partially denied the defendant's motion to dismiss]).
Dinowitz's Statements Were Nonactionable Opinion
Considering the deposition testimony and viewing each of Dinowitz's statements in context — a contentious community debate regarding the loss of the Annex and the claim of purposeful overcrowding at P.S. 24, allegations of racism, and Verdi's administrative complaint and federal lawsuit — we find that none of the statements constitute actionable defamation (see Steinhilber v Alphonse, 68 NY2d 283, 289 [1986] ["An expression of pure opinion is not actionable . . . no matter how vituperative or unreasonable it may be"]).Whether [*7]a reasonable listener could conclude that Dinowitz was conveying facts about Verdi is a question for the court (see id. at 290; see also 600 W. 115th St. Corp. v Von Gutfeld, 80 NY2d 130, 139 [1992], cert denied 508 US 910 [1993]). The factors to be considered in this analysis are whether: (1) the language at issue has a precise meaning that is readily understood; (2) the statements are capable of being proven true or false; and (3) either the "full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact" (Brian v Richardson, 87 NY2d 46, 51 [1995] [internal quotation marks omitted]).
First, at the October 2015 PA meeting, Verdi had the chance to immediately address Dinowitz's accusations and did so, thereby utilizing "available opportunities to contradict the lie or correct the error" and "minimiz[ing] its adverse impact on [his] reputation" (600 W. 115th St. Corp., 80 NY2d at 138 ["(T)he first remedy of any victim of defamation is self-help"], quoting Gertz v Robert Welch, Inc., 418 US 323, 344 [1974]; see also 161 Ludlow Food, LLC v L.E.S. Dwellers, Inc., 176 AD3d 434, 435 [1st Dept 2019] [dismissing the plaintiff's claim for slander per se where "the meeting was attended by plaintiff's managing member, such that plaintiff had the opportunity to correct the alleged misstatements and present his own, competing views"]). Moreover, a number of witnesses testified that the atmosphere at the PA meeting was "tense," "rowdy," "contentious," and "ugly." Under such circumstances, reasonable listeners "are aware that impromptu comments at a heated public debate . . . are more likely to be the product of passionate advocacy than careful, logically developed reason" (600 W. 115th St. Corp., 80 NY2d at 141).
Second, regarding Dinowitz's statements to the press, it has been our longstanding policy "to read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole" (Immuno AG. v Moor-Jankowski, 77 NY2d 235, 250 [1991], cert denied 500 US 954 [1991]; see also Aboutaam v Dow Jones & Co., 180 AD3d 573, 573 [1st Dept 2020]).In the March 2016 Riverdale Pressarticle, Dinowitz is quoted as stating: "[Verdi and Connelly] kept parents in the dark, they sat on their hands and they let disaster happen." The motion court found this statement to be defamatory because it implied that Verdi had authority to negotiate leases when he did not. The immediately preceding sentence, however, stated that Dinowitz "[understood] the principal does not handle leases, but that Ms. Connelly should have put pressure on the DOE to re-sign the deal." Thus, when read in context, a reasonable reader would not construe Dinowitz's statement as blaming Verdi for not exercising his authority to negotiate the Annex's lease [*8]or asserting that he was somehow directly responsible for its loss; rather, Dinowitz faulted Verdi for not advocating for the lease's renewal (see Steinhilber, 68 NY2d at 290 ["The question (of whether a statement is fact or opinion) is one of law for the court and one which must be answered on the basis of what the average person hearing or reading the communication would take it to mean"]).
Further, Dinowitz's use of the phrase "in my view" in the May 2016 Riverdale Review article plainly labels this statement as opinion.
The question of whether Dinowitz's May 3, 2016 statement to the Riverdale Press and the May 9, 2016 statements to WPIX-11 constitute nonactionable opinion, however, is much closer.
The Riverdale Press article began by detailing the "bombshell allegations" that Verdi asserted against Dinowitz in his federal lawsuit, including that he was "seeking to keep minority and lower-income students out" of P.S. 24 and that Martos reviewed the applications for kindergarten enrollment with this goal in mind. Glaser is quoted as stating: "Do parents know that some political hack is going through kids' records, has access to their records? It's a phony racist political football that they've created. There's never been any proof whatsoever that people who aren't from the district are coming in." Dinowitz responded: "In a desperate attempt to create a smokescreen to divert attention from the fact that he's the main reason for the severe overcrowding crisis at P.S. 24, Manny Verdi has brought a lawsuit containing one lie after another" and that "[Verdi] alone is responsible for that school not having a principal and this overcrowding crisis would not have happened but for Manny Verdi."
The WPIX-11 segment unfolded in a similar fashion. In the transcription, Glaser is first quoted as stating: "Kids are being turned into a political football and it amounts to racism. How do the parents of the school feel that a local political hack is going through privately protected records of kids that are enrolling in kindergarten. . . . It's shameful." The transcript proceeds to state that Dinowitz characterized Verdi's federal complaint as "a desperate attempt to take attention away from Verdi being the cause of the overcrowding crisis" at P.S. 24. Dinowitz is then quoted as stating: "Mr. Verdi and Mrs. Connelly made it their policy to enroll virtually any student into the school regardless of where they live and regardless of whether or not seats were available."
We begin our evaluation of whether a reasonable listener could conclude that Dinowitz was conveying facts about Verdi with the first and second factors: both statements are specific and readily understandable, and the accusation that Verdi is responsible for the overcrowding can be proven true or false (see Brian, 87 NY2d at 51). Indeed, both Shelton and Schwartz testified that enrollment was not handled by P.S. 24's principal or assistant principals, but by a separate department, and that [*9]the determination of whether students' registration information met enrollment criteria was performed by a computer. Thus, at first glance, these statements may be viewed as factual assertions.
We find, however, that the third factor of the analysis — whether the "full context of the communication in which the statement appears or the broader social context and surrounding circumstances" indicates to the audience that the statement is likely opinion and not fact — is of greater significance here (see Steinhilber, 68 NY2d at 291-292 ["A court must have the flexibility to consider the relevant factors and to accord each the degree of importance which the specific circumstances warrant"]). These statements cannot be analyzed in a vacuum; rather, they must be weighed against the backdrop of the entire dispute.
Given the history of the hyperbolic and public finger-pointing between the parties, a reasonable reader would conclude that Dinowitz's statements were opinion and merely "the product of passionate advocacy," especially considering that he was in the midst of litigation involving accusations of him manipulating student registration to advance a racist agenda (see Gentile v Grand St. Med Assoc., 79 AD3d 1351, 1353 [3d Dept 2010]). Although Dinowitz's status as an assemblyman may lead an average reader to interpret his statements as those of fact known to him through his involvement with the school and the community (see Brian, 87 NY2d at 53), "[e]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in . . . circumstances in which an 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole' " (Steinhilber, 68 NY2d at 294, quoting Information Control Corp. v Genesis One Computer Corp., 611 F2d 781, 784 [9th Cir 1980]).
We note that nearly all the publications in which the complained-of statements in Verdi's original and amended complaints appeared were localized to the Riverdale community, which, as the record demonstrates, was palpably engaged with the loss of the Annex, the school's overcrowding, and the controversial search for a new principal. Beginning with the October 2015 PA meeting, witnessed by numerous concerned parents, school administrators, and other community members, each incident underlying the clash between Verdi and Dinowitz was detailed in the series of articles at issue here. Thus, we can infer that the average person exposed to Dinowitz's statements would likely have knowledge concerning the surrounding circumstances behind Verdi's lawsuit and anticipate that Dinowitz would respond zealously.
Moreover, both the Riverdale Pressarticle and the WPIX-11 segment provided detailed explanations of how Dinowitz and Verdi (through Glaser) each blamed the other for the loss of the Annex lease as well as the school's overcrowding issue. They also explained that Verdi's suit included accusations that "Mashel and local elected officials conspired to remove[*10]" him from the school. Therefore, in our view, even a reader or viewer who was not familiar with the controversy would be likely to construe Dinowitz's statements as a response to the accusations against him.
Accordingly, we find that the five remaining statements as set forth in counts four, five, six, and eight of Verdi's amended complaint constitute nonactionable opinion.
Verdi Failed to Demonstrate that Dinowitz Acted with Actual Malice
Even if some of Dinowitz's statements could be regarded as fact rather than opinion, we agree with the motion court's finding that Dinowitz's statements may be entitled to a qualified privilege, as an overcrowded public school is a matter of public concern (see Braunstein v Day, 195 AD3d 589, 589-590 [2d Dept 2021], lv denied 37 NY3d 913 [2021]). We also agree with the motion court's determination that the "actual malice" standard should be applied in the evaluation of whether Dinowitz's conduct went beyond that protected by the qualified privilege (see Liberman v Gelstein, 80 NY2d 429, 437 [1992] ["The shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice'"]).
Verdi argued below, and reiterates here, that the more lenient "gross irresponsibility" standard is applicable. The "gross irresponsibility" standard applies to a private person and requires the plaintiff to "establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (Chapadeau v Utica Observer-Dispatch, 38 NY2d 196, 199 [1975]).
The motion court determined that the "gross irresponsibility" standard is inapplicable because Dinowitz is a nonmedia defendant, relying on our decision in Gottwald v Sebert (193 AD3d 573, 579-580 [1st Dept 2021] [declining to apply the "gross irresponsibility" standard because the defendant was "not a media publication, broadcaster or journalist responsible for observing the standards of information gathering and dissemination ordinarily followed by responsible parties"] [internal quotation marks omitted]). As discussed by the motion court, we have twice applied the Chapadeau standard to nonmedia defendants (see McGill v Parker, 179 AD2d 98, 107-108 [1st Dept 1992]; Ortiz v Valdescastilla, 102 AD2d 513, 518 [1st Dept 1984]). Nevertheless, although the Court of Appeals has never explicitly held that the "gross irresponsibility" standard is limited to media defendants, the context of its decisions lends support to this holding (see Huggins v Moore, 94 NY2d 296, 302-303 [1999] ["(W)hen the claimed defamation arguably involves a matter of public concern, a private plaintiff must prove that the media defendant acted in a grossly irresponsible manner. . . . Yet we have stated repeatedly that the Chapadeau standard is deferential to professional journalistic judgments"] [internal quotation [*11]marks omitted]; Karaduman v Newsday, Inc., 51 NY2d 531, 546 [1980] ["Indeed our standard of 'gross irresponsibility' demands no more than that a publisher utilize methods of verification that are reasonably calculated to produce accurate copy"]).
Since the "actual malice" standard applies here, Verdi must demonstrate by clear and convincing evidence that "each statement was made with either knowledge that it was false or reckless disregard for the truth" (Gottwald v Sebert, 40 NY3d 240, 251 [2023] [internal quotation marks omitted]).[FN1]
The motion court erred, however, in leaving the question of whether Dinowitz acted with "actual malice" to the factfinder. As long as there was a "full opportunity to conduct discovery," a plaintiff "must be held to the burden of adducing clear and convincing evidence of actual malice at the summary judgment stage" (Kipper v NYP Holdings Co., Inc., 12 NY3d 348, 357 [2009], citing Anderson v Liberty Lobby Inc., 477 US 242, 257 [1986]; see also Trails W. v Wolff, 32 NY2d 207, 221 [1973] ["It is well settled that summary judgment is properly granted where a qualified privilege obtains and the plaintiffs offer an insufficient showing of actual malice"]).
Here, the parties conducted full discovery. Verdi argues that several pieces of evidence demonstrate Dinowitz was aware that his statements were likely false. First, at least two witnesses testified that Dinowitz was discontented that he was no longer welcome with open arms at the school and expressed his intent to have Verdi and Connelly removed from their employment. Second, Dinowitz authored an email in January 2017 that stated: "You know very well that the lease is not negotiated by administrators at P.S. 24." Third, Verdi argues that Dinowitz had personal knowledge concerning certain DOE policies that permit children residing outside the school zone to be enrolled at P.S. 24, as his own children attended the school while the family resided outside the zone. Finally, Dinowitz testified that he had no actual proof that Verdi was not following school enrollment policies and was unable to identify any students that Verdi recruited to enroll, despite his statement that Verdi was actively recruiting out-of-zone students.
We find that Verdi failed to raise an issue of fact by presenting clear and convincing evidence that Dinowitz knew that his statements were probably false or entertained serious doubts as to their truth in satisfaction of the constitutional actual malice standard.[FN2] Although the witness testimony that Verdi relies upon lends itself to the conclusion that Dinowitz disliked him, evidence of ill will, standing alone, is insufficient for a showing of actual malice (see Carey v Carey, 220 AD3d 477, 479 [1st Dept 2023]). The remaining evidence must therefore demonstrate that Dinowitz made the statements with "a high degree of awareness" of their probable falsity or "entertained serious doubts as to [their] truth" (Blum v State of New York, 255 AD2d 878, 880[*12]-881 [4th Dept 1998], quoting Prozeralik v Capital Cities Communications, 82 NY2d 466, 474 [1993]).
The 2017 email in which Dinowitz states that the P.S. 24 administrators are not responsible for negotiating leases is not probative, as it was sent over a year after the PA meeting and several months after Dinowitz's statements to the press and does not demonstrate that Dinowitz was aware of this fact when each of the complained-of statements were made. Additionally, Dinowitz's knowledge of existing DOE policies permitting out-of-zone students to attend the school does not foreclose the possibility that school administrators were circumventing these policies and enrolling additional out-of-zone students who would not otherwise qualify. Dinowitz also testified that he believed Verdi's acceptance of out-of-zone students was common knowledge in the community, as several parents, school staff, and his colleagues had relayed similar sentiments to him. As noted, several other witnesses testified that they also held the same belief.
Consequently, the evidence does not support a finding that Dinowitz acted with actual malice. To the contrary, the record demonstrates that the parties engaged in a robust and contentious community-wide debate regarding overcrowding at P.S. 24, with back-and-forth hyperbolic accusations of racism, employment discrimination, and incompetence. This speech falls well within the bounds of the First Amendment.
Accordingly, the order of the Supreme Court, New York County (Lynn R. Kotler, J.), entered January 31, 2023, which granted plaintiff's motion for partial summary judgment, in part, and denied defendant's cross-motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, plaintiff's
motion denied, and defendant's cross-motion granted. The Clerk is directed to enter
judgment accordingly.
Order, Supreme Court, New York County (Lynn R. Kotler, J.), entered January 31, 2023, reversed, on the law, without costs, plaintiff's motion denied, and defendant's cross-motion granted. The Clerk is directed to enter judgment accordingly.
Kern, J.P., Singh, González, Pitt-Burke, Rosado, JJ.
Opinion by Singh, J. All concur.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 22, 2024

Footnotes

Footnote 1: As neither party argues that the common-law standard of malice should be applied, we apply the constitutional standard here (see Liberman, 80 NY2d at 437-438 ["Under common law, malice meant spite or ill will . . . however, the Supreme Court established an 'actual malice' standard for certain cases governed by the First Amendment: 'knowledge that (the statement) was false or . . . reckless disregard of whether it was false or not.' . . . . (W)e have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege"]).

Footnote 2: We note that, even under the more lenient "gross irresponsibility" standard, Verdi's evidence is still insufficient (see Karaduman, 51 NY2d at 542 ["Absent some showing that (the defendant) personally had reason to doubt the truthfulness of the statements in the articles, we find it difficult to understand how he could be held 'grossly irresponsible' "]; Shuman v New York Mag., 211 AD3d 558, 559 [1st Dept 2022] ["Plaintiffs' arguments as to defendants' gross irresponsibility are largely based on conclusory assertions as to what defendants knew or should have known pre-publication"], lv denied 40 NY3d 974 [2023]).